93 N.Y.2d 677 (1999)
720 N.E.2d 66
697 N.Y.S.2d 846
Louis GRUMET et al., Respondents,
v.
GEORGE PATAKI, as Governor of the State of New York, et al., Appellants.
Court of Appeals of the State of New York.
Argued February 10, 1999.
Decided May 11, 1999.
*678 Eliot Spitzer, Attorney-General, Albany (Peter H. Schiff, Barbara G. Billet and Julie S. Mereson of counsel), for George Pataki and others, appellants.
*679 Miller, Cassidy, Larroca & Lewin, L. L. P. (Nathan Lewin, Richard W. Garnett and Anthony J. Bellia, Jr., of the District of Columbia Bar, admitted pro hac vice, of counsel), and George Shebitz & Associates, P. C., New York City (George Shebitz, Julia R. Cohen and Nahal Motamed of counsel), for Board of Education of the Kiryas Joel Union Free School District, appellant.
*680 Ingerman Smith, L. L. P., Northport (Lawrence W. Reich of counsel), for Board of Education of the Monroe-Woodbury Central School District, appellant.
Jay Worona, Albany, for respondents.
*681 Kevin J. Hasson, Eric W. Treene and Roman Storzer, of the District of Columbia Bar, admitted pro hac vice, for The Becket Fund for Religious Liberty, amicus curiae.
*682 Marc D. Stern, New York City, for American Jewish Congress, amicus curiae.
Chief Judge KAYE and Judges CIPARICK and ROSENBLATT concur with Judge SMITH; Judge BELLACOSA dissents and votes to reverse in a separate opinion in which Judges LEVINE and WESLEY concur.

OPINION OF THE COURT
SMITH, J.
At issue on this appeal is whether chapter 390 of the Laws of 1997, which enables Kiryas Joel to create a separate school district for its disabled children, violates the Establishment Clause of the First Amendment of the United States Constitution. *683 We conclude that the legislation has the impermissible effect of advancing one religious sect and that it is unconstitutional.

I.
The long history underlying this action is fully chronicled in previous opinions by the Supreme Court of the United States and this Court (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687; Grumet v Cuomo, 90 NY2d 57; Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518, affd 512 US 687; Board of Educ. of Monroe-Woodbury Cent. School Dist. v Wieder, 72 NY2d 174). Kiryas Joel is a village comprised of Satmar Hasidic Jews residing in Orange County, New York. Residents of Kiryas Joel are devoutly religious and, among other things, follow a strict interpretation of the Torah, segregate the sexes outside the home and dress in a distinctive manner. The children of the Village are educated in parochial schoolsboys at the United Talmudic Academy, where they are taught the Torah and girls at Bais Rochel, where they are instructed and prepared for their roles as wives and mothers. Neither school, however, provides special educational services to handicapped children who, under State and Federal law, are entitled to such services even when enrolled in private schools (Individuals with Disabilities Education Act, 20 USC § 1400 et seq.).
Prior to 1985, the handicapped children of Kiryas Joel, located within the Monroe-Woodbury Central School District, received special educational services provided by Monroe-Woodbury in a building annexed to Bais Rochel. In 1985, following the decision of the Supreme Court in Aguilar v Felton (473 US 402) and School Dist. of City of Grand Rapids v Ball (473 US 373)which ruled that publicly funded classes on religious school premises violated the Establishment Clause Monroe-Woodbury ceased offering on-site schooling to Kiryas Joel's handicapped children. That decision, now overruled by the Supreme Court, triggered the years of litigation preceding this appeal.
After several months of sending their handicapped children to public schools to receive the special education services, the parents of Kiryas Joel refused to continue the arrangement, alleging that the children experienced fear and trauma in leaving their community and interacting with people whose ways were so different from theirs (Board of Educ. of Monroe-Woodbury Cent. School Dist. v Wieder, 72 NY2d 174, 181, *684 supra). Many sought administrative review of Monroe-Woodbury's decision to offer the special education services only in public schools. Monroe-Woodbury commenced a declaratory judgment action, seeking a declaration that Education Law § 3602-c compelled it to furnish special education services only in regular classes and programs of the public schools, and not elsewhere. This Court ruled that the law neither compelled Monroe-Woodbury to provide special education to Kiryas Joel's handicapped children in public schools, nor required it to do so in a segregated setting, as was urged by Kiryas Joel (id., at 188). Instead, this Court ruled that Monroe-Woodbury provide the special services at a site reasonably accessible to Kiryas Joel's handicapped children (id., at 184).

A. KIRYAS JOEL I

In an effort to resolve the longstanding controversy between Kiryas Joel and Monroe-Woodbury, the Legislature enacted chapter 748 of the Laws of 1989,[1] which established a union free school district coterminous with Kiryas Joel within the boundaries of Monroe-Woodbury. In Grumet v Board of Educ. of Kiryas Joel Vil. School Dist. (81 NY2d 518, supra), this Court held that chapter 748 contravened the Establishment Clause of the First Amendment of the Federal Constitution because it violated the second prong of the three-part test delineated in Lemon v Kurtzman (403 US 602). The Court reasoned that because the newly formed school district was coterminous with Kiryas Joel, only Hasidic children would attend the public school, and only members of the Hasidic sect would likely serve on the school board. The Court concluded that the statute therefore constituted a "symbolic union of church and State effected by the establishment of the Kiryas Joel Village School District * * * [and was] likely to be perceived by the Satmarer *685 Hasidim as an endorsement of their religious choices, or by nonadherents as a disapproval of their individual religious choices" (Grumet v Board of Educ., 81 NY2d, supra, at 529).
The Supreme Court affirmed this Court's holding in Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet (512 US 687, supra [Kiryas Joel I]). In a 6 to 3 decision, the Supreme Court ruled that chapter 748 violated the prohibition against government establishment of religion because the act was "tantamount to an allocation of political power on a religious criterion and neither presupposes nor requires governmental impartiality toward religion" (512 US, at 690). The Court stated that the statute departed from a constitutional requirement of neutrality toward religion "by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally" (id., at 696; see also, id., at 703). The legislative act, in the words of the Supreme Court, left "the Court without any direct way to review such state action for the purpose of safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion" (id., at 703).

B. KIRYAS JOEL II

Four days after the Supreme Court's decision in Kiryas Joel I, the Legislature responded by passing chapter 241 of the Laws of 1994. Under the new statute, a municipality located wholly within a single central or union free school district but whose boundaries were not coterminous with the boundaries of any preexisting school district could establish its own school district whenever the educational interests of the community required it (Grumet v Cuomo, 90 NY2d 57, supra [Kiryas Joel II], citing Education Law § 1504 [former (3)] [a]).[2] The statute set forth facially neutral criteria that a municipality could satisfy in order to establish a school district and delineated the *686 process by which the new school district could be formed. The statute further defined the term "municipality" as "a city, town or village in existence as of the effective date of this subdivision" (Education Law § 1504 [former (3)] [g]).
This Court held chapter 241 of the Laws of 1994 unconstitutional for two reasons (Grumet v Cuomo, supra). First, this Court determined that although the statute was facially neutral, it had a nonneutral effect of allowing Kiryas Joel to create its own school district without providing the same opportunity to other groups. Specifically, the Court reasoned that by limiting its applicability to municipalities "in existence as of the effective date, of the statute, any group, religious or nonreligious, subsequently incorporated as a municipality was effectively cut off from utilizing chapter 241's procedures (id., at 72). The definitional limitation manifested itself in such a way that only one sect reaped the benefits of the statute Kiryas Joel. The Court noted that the Legislature might have achieved a constitutionally acceptable result if it had enacted a law of "general applicability that the Village of Kiryas Joel, as one in a broad array of eligible municipalities, might have invoked" (id., at 75 [emphasis added]).
Second, the Court determined that chapter 241, like its predecessor, failed the second prong of the Lemon test (id., at 68). The Court stated that, inasmuch as Kiryas Joel was the only municipality eligible to benefit from the statute, "the enactment of chapter 241 would be perceived as an act of governmental favor for the sole benefit of the Satmar sect" (id., at 75).

C. THE STATUTE UNDER REVIEW
Three months after the Court's determination in Kiryas Joel II that chapter 241 was unconstitutional, the Legislature enacted a third statutechapter 390 of the Laws of 1997, or "The Kiryas Joel School Bill"which is before us on this appeal (Education Law § 1504 [3], added by L 1997, ch 390). Education Law § 1504 (3)[3] delineates criteria which a municipality, "situated wholly within one central or union free school district but whose boundaries are not coterminous with the *687 boundaries of such school district," may follow in order to establish its own school district. The statute prescribes that (i) the new school district equal at least 2,000 children and that it be no greater than 60% of the enrollment of the existing school district from which the school district will be organized, (ii) the newly formed district have an actual valuation per total wealth pupil unit at least equal to the State-wide average, and (iii) the enrollment of the existing school district from which the new district is formed equal at least 2,000 children, excluding the residents of the municipality (Education Law § 1504 [3] [a], as added by L 1997, ch 390).
Plaintiffs Louis Grumet and Caroline Shipley, citizen taxpayers,[4] commenced the present action against the Governor and various departments and officials, the Board of Education of the Kiryas Joel Union Free School and Monroe-Woodbury, challenging the constitutionality of chapter 390 under both the Federal and State Constitutions. The court concluded that chapter 390 definitively applies to only two municipalities Kiryas Joel and one otherand that the law represented unequivocal but impermissible favoritism by the State to the Satmar community. The court granted plaintiffs' motion for summary judgment and permanently enjoined defendants "from taking any and all present, future action or expending any State monies or resources for the purpose of implementing Chapter 390 of the Laws of 1997."
The Appellate Division unanimously affirmed, agreeing that the record supports the conclusion that the new statute applies to only two of the State's 1,545 municipalities and concluding that chapter 390 is not a "`truly religious-neutral law of general applicability * * * [available to] a broad array of eligible municipalities'" (Grumet v Pataki, 244 AD2d 31, 36, quoting *688 Grumet v Cuomo, 90 NY2d, supra, at 75). The Appellate Division further concluded that chapter 390 failed the second prong of the Lemon test because it "clearly provides an impermissible preference to the Village in response to the Satmars' desire to provide their handicapped children with special education services in an exclusive Satmar environment" in light of the statute's legislative history and context (244 AD2d, at 36-37).
Finally, the Appellate Division noted that the Supreme Court's decision in Agostini v Felton (521 US 203) overruled the Court's prior decision in Aguilar v Felton (473 US 402, supra). Thus, Monroe-Woodbury was no longer precluded from offering Kiryas Joel's children special educational services at the Hasidic school. Accordingly, the Court stated that "the fact that the underlying reason for the creation of the challenged school districts has now been eliminated also supports plaintiffs' assertion that chapter 390 should be perceived as yet another improper endorsement by the Legislature in providing the Satmar community the continued existence of a publicly funded exclusive environment in which to educate their children in accordance with their religious preferences" (244 AD2d, at 37).
Defendants appealed as of right, and we now affirm the order of the Appellate Division.[5]

II.
The Establishment Clause of the First Amendment of the Federal Constitution, made applicable to the States through the Fourteenth Amendment, prescribes that "Congress shall make no law respecting an establishment of religion" (US Const 1st Amend). The Establishment Clause ensures that neither the State nor the Federal government "can pass laws which aid one religion, aid all religions, or prefer one religion over another" (Everson v Board of Educ., 330 US 1, 15). The clause requires that States be "neutral in [their] relations with groups of religious believers and non-believers" (id., at 18). Applying these fundamental neutrality principles, this Court has stated that "statutes of general applicability that extend their benefits without regard to religion honor the neutrality requirement and are generally beyond Establishment Clause reproach" (Grumet v Cuomo, 90 NY2d, supra, at 69). On the other hand, *689 the Establishment Clause is violated when a sectarian school enlists "the machinery of the State to enforce a religious orthodoxy" (Lee v Weisman, 505 US 577, 592).[6]
Significantly, the facial neutrality of a law is not dispositive (Grumet v Cuomo, 90 NY2d, supra, at 70, citing Church of Lukumi Babalu Aye v City of Hialeah, 508 US 520, 534 ["The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination"]). In determining whether a statute comports with fundamental Establishment Clause principles, and is "truly religion-neutral and generally applicable," a court must scrutinize the law both in form and effect (Grumet v Cuomo, 90 NY2d, supra, at 70).
Considering both the form and the effect of the statute now before us, we conclude that chapter 390 violates fundamental Establishment Clause neutrality principles. Although chapter 390 sets forth facially neutral criteria, any attempt to characterize the statute as a religion-neutral law of general applicability is belied by its actual effect (Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US, supra, at 703). Presently, chapter 390 potentially benefits only the Village of Kiryas Joel and one other of the State's 1,545 municipalitiesthe Town of Stony Point.[7] In practical effect, therefore, the religious community of Kiryas Joel is not "merely one in a series of communities" eligible for equal treatment under chapter 390's special school district laws (512 US, supra, at *690 703-704; see also, Grumet v Cuomo, 90 NY2d 57, 73, supra).[8] That only two municipalities in all of New York State qualify under chapter 390 underscores the fact that groups finding themselves in a situation similar to that confronting the Satmar community will be unable to avail themselves of the statute's benefits. Indeed, because the statute's qualifying criteria are consciously drawn to benefit Kiryas Joel, other communitiesboth religious and secularwith similar educational needs will not have equal opportunity to create a publicly funded school district under chapter 390. Thus, the nonneutral effect of the statute is to secure for one religious community a unique and significant benefita "public school" where all the students adhere to the tenets of a particular religionunavailable to other, similarly situated communities. In doing so, chapter 390 violates Establishment Clause principles by'preferring one religion over others (512 US, supra, at 703).
Chapter 390 eliminated some of the fatal flaws of chapter 241its unconstitutional predecessorbut the effect of the two statutes is virtually identical. Although only one municipalityKiryas Joelqualified under the prior statute, it does not follow that chapter 390by allowing one additional municipality to qualify under the statuteis a general, religion-neutral law. Indeed, while it is true that chapter 390 eliminated the two qualification criteria of chapter 241 that were devoid of any legitimate purpose and plainly intended to limit eligibility under the statute to Kiryas Joel, the new statute fails to eradicate the earlier statute's overriding flaw. The eligibility requirements under chapter 390 are still limited in such a way that permits the statute's benefits to flow almost exclusively to the religious sect it was plainly designed to aid. Thus, like its *691 predecessor, chapter 390 is not a neutral law of general application.[9]

III.
In assessing the constitutionality of governmental action under the Establishment Clause, the Supreme Court of the United States has employed a number of tests, reflecting that not all cases are susceptible of review under a single standard (see, e.g., Lee v Weisman, 505 US 577, supra; County of Allegheny v American Civ. Liberties Union, 492 US 573; Larson v Valente, 456 US 228; Marsh v Chambers, 463 US 783).
The standard most often used is the tripartite test of Lemon v Kurtzman (403 US 602, supra), which requires that legislation have a secular purpose, that its principal effect neither advance nor inhibit religion, and that it not foster excessive entanglement between church and State. In recent years, the Supreme Court has questioned the Lemon test, but has not abandoned it. Indeed, in Agostini v Felton (521 US 203, supra), the Court observed:
"To be sure, the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed since Aguilar was decided. For example, we continue to ask whether the government acted with the purpose of advancing or inhibiting religion, and the nature of that inquiry has remained largely unchanged. * * * Likewise, we continue to explore whether the [government action] has the `effect' of advancing or inhibiting religion" (id., at 222-223).
Agostini thus makes clear that the second prong of the Lemon test (403 US, supra, at 612)the requirement that a law's "primary effect must be one that neither advances nor inhibits religion"remains a consideration in assessing whether the Establishment Clause has been violated. Thus, the question in this case continues to be whether chapter 390 of the Laws of *692 1997 has the effect of advancing one religion over another. We conclude that it does.
Agostini, the most recent Supreme Court pronouncement on the application of Establishment Clause principles, presented a situation different from the one now before us. In Agostini the Supreme Court reviewed whether the placement of public school employees in parochial schools, under title I of the Elementary and Secondary Education Act for the purpose of providing remedial education to disadvantaged children, resulted in the impermissible effect of advancing religion. As such, the Court's "effects inquiry" necessarily focused on whether the presence of public school teachers in parochial school classrooms results in religious indoctrination or the inculcation of religious messages, creating the impression of a "symbolic union" or an "excessive entanglement" between church and State (521 US, supra, at 222-223, 232-233).
The Court concluded that having public school teachers provide services to students in parochial schools does not have an impermissible effect because it does not result in governmental indoctrination, define its recipients by reference to religion or create excessive governmental entanglement with religion (521 US, supra, at 234). Under title I, a broad spectrum of disadvantaged childrenfrom both secular and religious schoolswould be provided the same benefits on a nondiscriminatory basis and as a result, the Court noted, such aid was less likely to have the effect of advancing religion (id., at 231; see also, id., at 210 [only 10% of the total number of students eligible for title I services are private school students attending sectarian schools; some 183,000 children nationwide received title I benefits]). The Court further noted that such a program could not be viewed as an endorsement of religion (id., at 235).
Unlike Agostini, the act under review here does not fall into one of the two usual types of Establishment Clause cases: chapter 390 neither provides public aid to a parochial school nor prescribes religious practices for a public school. Rather, it delegates to a religious group the governmental power to form its own public school district, which carries with it vast powers (see, Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518, 537, n 5, supra [Kaye, Ch. J., concurring]). Thus, even more directly pertinent to our analysis is Kiryas Joel I (512 US 687, supra), with facts and issues similar to those now before us. In Kiryas Joel I, the Supreme Court, implicitly relying upon Lemon's second prong, concluded that the statute creating the Kiryas Joel School District was unconstitutional *693 because it provided a benefit to the Satmar community that was not provided equally to other groups (512 US, at 703-704, citing Larkin v Grendel's Den, 459 US 116). The Court concluded that by singling out Kiryas Joel for special treatment, as opposed to making the statutory benefits available to "many communities," the statute violated the principle of neutrality to which all permissible religious accommodations must adhere (id.; see also, id., at 703 [because statute was so narrowly drawn, it provided "no assurance that the next similarly situated group seeking a school district of its own will receive one"]). The Court determined that the statute constituted an impermissible religious accommodation under the Establishment Clause and focused on the fact that the statute's exclusive delegation of significant governmental power to a religious sect failed to ensure that similarly situated groups would also be able to avail themselves of that power (id., at 705-708).
This Court's unanimous decision in Grumet v Cuomo (90 NY2d 57, supra), three years after the Supreme Court's decision in Kiryas Joel I, also provides guidance. Analysis of whether chapter 241 was a "truly religion-neutral and generally applicable" law was based on the fundamental neutrality principles expressed by the Supreme Court's many Establishment Clause cases, including Kiryas Joel I. This Court, noting that the Supreme Court had recognized as an important index of secular effect the "`provision of benefits to [a] broad * * * spectrum of groups,'" found that the corollary to that proposition was also truenamely, that the "provision of a governmental benefit to a restricted class * * * formed along religious lines * * * is a telling index of nonneutral sectarian effect" (id., at 70, citing Widmar v Vincent, 454 US 263, supra; Board of Educ. of Westside Community Schools v Mergens, 496 US 226, 248, supra). Applying established neutrality requirements, the Court concluded that chapter 241 had the nonneutral effect of allowing only Kiryas Joel to reap the statute's benefits, without providing the same opportunity to other groups.
As such, even though the statute was facially neutral and did not specifically name the Village of Kiryas Joelas was the case in Kiryas Joel Iit still could not be considered a generally applicable, religion-neutral law (90 NY2d, supra, at 73 [statute did not provide benefits to Satmar community "`simply as one of many communities eligible for equal treatment under a (truly) general law'"], citing Kiryas Joel I, 512 US, at 703, supra). Furthermore, the Court determined that chapter 241 *694 failed the second prong of the Lemon test because its actual and perceived effect was solely to advance the interests of the Satmar community[10] (id., at 73-76). The Court also noted that "the Legislature might have achieved a constitutionally acceptable result had it enacted a truly religion-neutral law of general applicability that the Village of Kiryas Joel, as one in a broad array of eligible municipalities, might have invoked" (id., at 75).
In sum, while several standards have been employed by the Supreme Court to determine the constitutionality of a statute under the Establishment Clause, they all build upon the same foundation: fundamental neutrality principles. Indeed, to consider whether a statute has the impermissible effect of advancing religion or constitutes an impermissible religious accommodation is essentially to examine both sides of a coin. Under either inquiry, a statute so narrowly drawn that it delegates a significant governmental power almost exclusively to a single religious group, and provides no assurance that the statute's benefits will be equally available to others, is unconstitutional.

IV.
Drawing on Supreme Court precedents, as well as our own case law, we conclude that, for many of the same reasons chapter 390 violates fundamental Establishment Clause neutrality principles, it has the primary effect of advancing one religion over others and constitutes an impermissible religious accommodation.
The events surrounding the enactment of chapter 390 offer strong support for the conclusion that chapter 390 has the effect of advancing the religious beliefs of the Satmars over others. *695 The legislative history of chapter 390 reveals that it was enacted in direct response to Kiryas Joel II and with the intent to accomplish what previous legislative efforts had failed to accomplish: provide the residents of Kiryas Joel with an exclusively Satmar "public school" environment, at taxpayer expense, in which to educate their children. Indeed, the legislative debates reveal that the law was referred to as the "Kiryas Joel School Bill" and that chapter 390 was commonly referred to as "Kiryas Joel No. 3" (New York State Assembly, L 1997, ch 390, Legislative Debates, Aug. 4, 1997, at 88).
That chapter 390 was designed to accommodate the needs of the religious community of Kiryas Joel is not, however, what renders it unconstitutional. Indeed, a statute accommodating a religious group does not automatically create the impermissible effect of advancing religion (Kiryas Joel I, 512 US, supra, at 705-706; see also, Agostini v Felton, 521 US, supra, at 233). Supreme Court precedent makes clear that a statute accommodating religious needs by alleviating special burdens will not have the primary effect of advancing religion so long as the secular effect of the statute is sufficiently separable from its religious impact and the class benefitted by the statute is sufficiently broad (see, Grumet v Cuomo, 90 NY2d 57, supra; Committee for Pub. Educ. & Religious Liberty v Nyquist, 413 US 756, 768; Widmar v Vincent, 454 US 263, 274, supra; Walz v Tax Commn. of City of N. Y., 397 US 664, 673, supra; Mueller v Allen, 463 US 388, 397). In other words, a permissible accommodation must honor the principle of neutrality as among religions (Kiryas Joel I, 512 US, supra, at 706-707; id., at 705 ["there is `ample room under the Establishment Clause for "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference"'"]).
Applying the foregoing principles here, it is clear that chapter 390 does not constitute a permissible religious accommodation. The class benefitted under chapter 390 is anything but broad. Recognition of the fact that the statute benefits an extremely narrow class of municipalities is not a mere exercise in arithmetic or counting (see, dissenting opn, at 706). The Supreme Court has held that the provision of benefits to a "broad * * * spectrum of groups is an important index of secular effect"[11] (Widmar v Vincent, 454 US 263, 274, supra; see also, Kiryas *696 Joel I, 512 US, supra, at 703 [because Kiryas Joel "did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law," neutrality could not be assured]; Board of Educ. of Westside Community Schools v Mergens, 496 US 226, 252, supra [statute did not have the primary effect of advancing religion where high school Christian club was merely one in a broad spectrum of clubs granted benefits thereunder]; Walz v Tax Commn. of City of N. Y., 397 US 664, 673, supra [property tax exemption for religious properties upheld where it applied to "broad class of property owned by nonprofit, quasi-public corporations," not just religious groups or churches]; Bowen v Kendrick, 487 US 589, 608 [statute enlisting "wide spectrum of organizations" upheld]; Kiryas Joel II, 90 NY2d, supra, at 75 [a truly religion-neutral law of general applicability would apply to Kiryas Joel as "one in a broad array of eligible municipalities"]). Given chapter 390's applicability to only two municipalitiesone of which is a religious sect clearly intended to be the statute's beneficiarythe secular effect of the statute is virtually indiscernible.[12]
Taking into account both the origin and operation of the statute, therefore, the conclusion is inescapable that chapter 390 has the primary effect of advancing religion and constitutes an impermissible accommodation (Kiryas Joel I, 512 US 687, 698, 706-707, supra; see also, Grumet v Board of Educ., 81 NY2d 518, supra; Grumet v Cuomo, 90 NY2d 57, supra).

V.
As we previously noted, chapter 748 was enacted in response to the situation in which Kiryas Joel was placed after Aguilar, and to address the conflict that ensued between Monroe-Woodbury and Kiryas Joel (Grumet v Board of Educ., 81 NY2d, supra, at 525, citing Governor's Approval Mem, 1989 NY Legis Ann, at 324). The subsequent legislation is an effort to address the same problems. Since Agostini, the Supreme Court has eliminated the obstacle posed by Aguilar to the education of the handicapped children in an exclusive Satmar setting. As *697 noted in the legislative debates by opponents of chapter 390: "This legislation is legislation * * * that is not necessary. If given the time and given the inclination to make the process work, students who are designed to be aided could be aided without this legislation" (New York State Assembly, L 1997, ch 390, Legislative Debates, Aug. 4, 1997, at 90). As such, the Appellate Division properly concluded that enacting chapter 390 would likely be perceived as a religious preference in light of the arguably constitutionally permissible alternative Agostini has provided.
Given the foregoing conclusions, we need not address the challenges posed under the State Constitution.
We conclude with an observation that we hope has not been lost on parties who have been locked in litigation for more than a decade. The genesis of all this legislation and litigationthe seeming insurmountability of Aguilar v Feltonno longer exists. It is now possible, compatibly with the Federal Constitution, to do what the parties wanted to do before Aguilar stopped them. Given this new opportunity, we strongly suggest that the parties make every effort to reach an accord that will benefit the children, and themselves. This is far preferable to the costly and inevitable prospect of further legal strife.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
BELLACOSA, J. (dissenting).
Respectfully, we would declare chapter 390 of the Laws of 1997 constitutional. Thus, our vote is to reverse the order of the Appellate Division.
The constitutional cornerstone of this statute rests on three strong pillars: (1) the presumption of constitutionality afforded to every enactment of the Legislature; (2) the lack of any persisting or new constitutional faults under presently governing Establishment Clause jurisprudence; and (3) the explicit removal from chapter 390 of previously adjudicated constitutional defects.

I.
Initially, the "simple, but well-founded, presumption that an act of the Legislature is constitutional * * * can be upset only by proof persuasive beyond a reasonable doubt" (Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 370 [citations omitted]). Indeed, this Court frequently prefaces its statutory analyses with the acknowledgment that a legislative enactment derives from a "co-equal branch of government", and any *698 challenger trying to undo a statute bears a heavy burden (City of New York v State of New York, 76 NY2d 479, 485; see also, Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489, 495).
As a corollary to these fundamental premises, a "further presumption, long recognized by this court, [is] that the Legislature has investigated and found facts necessary to support the legislation * * * as well as the existence of a situation showing or indicating its need or desirability" (Hotel Dorset Co. v Trust for Cultural Resources, supra, at 370 [citations omitted]). Balancing the myriad policy and empirical considerations that affect lawmaking is a function entrusted by the Constitution to the Legislature, the elected representatives of the people; courts are obliged, therefore, to be exceedingly wary of substituting their own balancing exercises (see, Matter of Wolpoff v Cuomo, 80 NY2d 70, 79). In particular, courts owe respectful attentiveness "to public funding programs essential to addressing the problems of modern life, unless such programs are `patently illegal'" (Schulz v State of New York, 84 NY2d 231, 241, citing Hotel Dorset Co. v Trust for Cultural Resources, supra).
Chapter 390 of the Laws of 1997 allows some public funding to qualifying municipalities through the instrumentality of a separate public school district. It is uncontroverted that the Legislature's initial impetus for crafting an enactment was to redress a modern educational conundrum encountered by the Village of Kiryas Joel with respect to some of its neediest citizens, its handicapped children. It is also undisputed that when the two prior versions of statutory authorization were declared constitutionally faulty, the Legislature corrected the identified problems. Indeed, it is now three times that different Legislatures have passed, and two different Governors have approved, legislation to address the conceded concerns of these needy children within the environment of their civic community.
We dissenters examine the legislation as enveloped, not "insulated" as the Majority suggests, by its traditional array of presumed legitimacy (majority opn, at 689, n 6). From our well-established analytical perspective, the Legislature meets all constitutional prescriptions, including those previously delineated by this Court.

II.
In May 1997, this Court nullified chapter 241 of the Laws of 1994, the Legislature's second attempt to allow the people of *699 the incorporated Village of Kiryas Joel to form a separate public school district. This Court found the definition of municipality as the principal flaw because it was limited, such that no existing municipality, aside from Kiryas Joel, met, or probably ever could meet, the statutory requirement.
This Court unanimously agreed that the statutory effect of singling out the Village of Kiryas Joel in this manner violated the second prong of the Lemon test, which mandates that government action cannot have a principal or primary "effect" of advancing or inhibiting religion (Lemon v Kurtzman, 403 US 602, 612). Also relying on an "endorsement" examination, this Court noted that even when a challenged statute appears neutral on its face, the Supreme Court has guarded against State action that is sufficiently likely to be perceived by adherents of a religion as an endorsement and by nonadherents as a disapproval of their religious or nonreligious choices (see, Grumet v Cuomo, 90 NY2d 57, 74 [Kiryas Joel II], citing School Dist. of City of Grand Rapids v Ball, 473 US 373, 390, overruled in part by Agostini v Felton, 521 US 203).
A month later, in June 1997, the Supreme Court of the United States decided Agostini v Felton (521 US 203, supra). It scrutinized the evolution of Establishment Clause jurisprudence since the 1985 decision of Aguilar v Felton (473 US 402) and overruled it. Ironically, Aguilar had triggered the initial difficulties between the Village of Kiryas Joel and the Monroe-Woodbury School District. The Supreme Court, in Agostini, without expressly indicating so, compressed the Lemon test into two prongs(1) whether the government acted with a secular purpose; and (2) whether the government aid has the "effect" of advancing or inhibiting religion, which includes an examination of whether the aid results in an excessive entanglement between church and State (see, Agostini v Felton, supra, at 222-223, 232-233; see also, Baxter, Managing Legal Change: The Transformation of Establishment Clause Law, 46 UCLA L Rev 343, 399-409 [1998]).
Indeed, the Agostini Court went into great detail about changes in the contours of this jurisprudence since its Aguilar and Ball decisions; specifically, changes emerged in the Supreme Court's understanding of the criteria used to assess whether aid to religion has an impermissible effect (see, Agostini v Felton, supra, at 223). The Supreme Court stated that the "three primary criteria we currently use to evaluate whether government aid has the effect of advancing religion" are: whether the aid results in governmental indoctrination; *700 whether aid recipients are defined by reference to religion; and whether an excessive entanglement is created (id., at 234).
Applying these criteria, Agostini stated that "where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis", there is a less likely effect, of advancing religion (id., at 231). The Supreme Court very significantly and specifically noted that Ball and Aguilar had not considered this important result of neutral criteria (id., at 231). Further, using the same delineated "effects" considerations to perform an "endorsement" analysis, the Supreme Court also did not find an endorsement of religion where funding was provided on a neutral basis (id., at 235; see also, Baxter, op. cit., 46 UCLA L Rev, at 409). Accordingly, Agostini overruled Aguilar and the pertinent parts of Ball (see, Agostini v Felton, supra, at 236). In particular, the Agostini Court noted that it was not "willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid" (id., at 229).
It was at this key point in the maturity of the First Amendment (Establishment and Free Exercise of Religion) that the New York State Legislature, in August 1997, enacted chapter 390 of the Laws of 1997.
III.
Since the examination of the first statutory effort in 1989, various courts have indicated that a neutral statute would be constitutionally acceptable. The Supreme Court of the United States indicated that the 1989 statute, which referred to Kiryas Joel by name, was too narrow considering the religious nature of the Village and the "anomalously case-specific nature of the legislature's exercise of state authority" (Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 703 [Kiryas Joel I], affg Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518). Justice O'Connor, however, suggested that "[a] district created under a generally applicable scheme would be acceptable even though it coincides with a village that was consciously created by its voters as an enclave for their religious group" (id., at 717 [O'Connor, J., concurring]).
Then, this Court found that the 1994 version of the statute, which was considered facially neutral, still did not insure appropriate neutrality in application. Due to the "nonneutral effect of allowing the religious community of Kiryas Joel, but no *701 other group at this time and probably ever, to create its own school district," the statute was deemed unconstitutional (Grumet v Cuomo, 90 NY2d 57, 69, supra). On the other hand, the Court said that, "statutes of general applicability that extend their benefits without regard to religion honor the neutrality requirement and are generally beyond Establishment Clause reproach" (90 NY2d 57, 69, supra).
Thus, at this Court's explicit suggestion, the Legislature, in chapter 390 of the Laws of 1997, removed the defects of the second statute, particularly the singular focus and effect of the definition of municipality (see, id.). It cannot be denied that chapter 390 does not limit the effect of its remedial authorization to the Village of Kiryas Joel alone; it definitionally expands the reach of the statutory authorization to at least one actual, additional secular entity, and countless potential others.
The Court is unanimous that, in ruling on chapter 390, this Court is bounduntil the Supreme Court specifically chooses to further recalibrate or overrule Lemonto apply the Establishment Clause principles promulgated in Agostini. Our application, however, of Agostini's version of the Lemon test leads us as dissenters to the conclusion that chapter 390 has a clear secular purpose. It provides a "mechanism by which the governing body of a municipality can initiate the process of forming a school district" (Governor's Mem approving L 1997, ch 390, 1997 NY Legis Ann, at 259). Even the purpose of the original statute was to obtain the secular goal of educating the handicapped children of Kiryas Joel (see, Governor's Mem approving L 1989, ch 748, 1989 NY Legis Ann, at 324-325; Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518, 550, supra [Bellacosa, J., dissenting]).
Further, the government "aid" here does not have the effect of advancing religion. Quite to the contrary, it simply grants permission to any qualifying municipality to create its own public school district. After Agostini, it is no longer presumed that improper religious indoctrination will occur even in a parochial school sectarian setting (see, Agostini v Felton, supra, at 223). Thus, no justification exists for the conclusion that the public school district at issue, which is coterminous with the boundaries of the Village of Kiryas Joel, will function any differently from any other public school district. Indeed, the record of the Kiryas Joel School District shows scrupulous adherence to secular personnel, administration, syllabi, and teaching methodsand equally scrupulous avoidance of sectarian, religious instruction or indoctrination.
*702 The direct "aid recipients" here are any qualifying municipalities. They are defined without reference to religion and with reference only to neutral secular criteria that were emphasized in this Court's previous adjudication concerning this intractable conflict. Indeed, the recognized population and wealth criteria are the typical factors used in effective legislation. Pursuant to Agostini, courts must accord weight to the neutrality of these qualifying factors as evidence that no improper effect or endorsement of religion occurs (see, id., at 231). Also, it is entirely appropriate to acknowledge the ultimate "aid recipients"handicapped children in need of special, secular education.
Finally, no excessive entanglement is engendered by chapter 390. "[T]o assess entanglement, we have looked to `the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority'" (id., at 232 [citations omitted]). Here, the institutions initially benefitted are municipalities conscientiously endeavoring to serve their constituents, and the Village of Kiryas Joel is such an incorporated municipality. Contrary to a fundamental fallacy expressed in the Majority's analysis (majority opn, at 694), the resulting relationship is not between government and a religious entity, but between the State and its municipal subdivisions, which includes the Village of Kiryas Joel. The State can provide "aid" in the form of a new school district for any qualifying municipality, much as it can now provide pre-Aguilar "aid" to any qualifying parochial school.
The Supreme Court exercised care in Agostini to extricate its jurisprudence from its own misstep and to explicate the current state and sophisticated nuances of Establishment Clause precedents. However, the Majority here, in effect transforms the Agostini lesson into an instrument of unremitting invalidation of State legislation.

IV.
It is necessary to address some specific and key differences that we have with the Majority's multi-faceted rationale. First, a fundamentally flawed reliance is placed on an examination of whether this statute provides an impermissible accommodation of religion. A corollary of the Majority's inquiry in this regard searches for whether a sufficiently "broad spectrum" of groups is benefitted. Further, the constitutional, analytical mix pivots off the legislative "history" and "origin" of the statute *703 (majority opn, at 695, 696); that is a faulty starting point. Finally, the Majority's invocation of the possibility of a renewed availability of the pre-Aguilar municipal options is wholly inapplicable (contrast, Marbury v Madison, 1 Cranch [5 US] 137 [1803] [on the establishment of the seminal doctrine of judicial review, within limitations, however, of the fundamental separation of powers doctrine]).

A. Religious Accommodation
The Majority chooses to follow an analysis performed earlier by the United States Supreme Court in Kiryas Joel I, without the subsequent enlightenment of Agostini, because the "facts and issues" before this Court are more similar, as they see it, to those addressed in Kiryas Joel I (majority opn, at 692). However, the Majority ignores the critical fact that the statute now at issue is significantly different from the statute struck down in Kiryas Joel I. It had specifically named the Village of Kiryas Joel as the sole beneficiary of the first legislative effort. Under that structure, as this Court and the Supreme Court discerned, there was simply no guarantee that any other similarly situated group would garner the same benefits (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 703, supra). The initial statute constituted an impermissible accommodation because it transferred political authority directly to a single religious group (id., at 706).
In finding an impermissible accommodation under the initial statute, the Supreme Court contrasted the statute with the "neutral" Village Law under which Kiryas Joel had incorporated (id., at 703). Significantly, this law permits any group meeting certain "population and area requirements" to incorporate (Village Law § 2-200). It cannot be denied that chapter 390 also utilizes such neutral population and area requirements to transfer political authority to any qualifying municipality. Thus, the new statute has corrected the aspects of the legislation that failed the accommodation analysis in Kiryas Joel I, and the Majority nevertheless interposes a reconstituted standard in this regard.
This shaky accommodation concern incorporates another facet of the Majority view that we dissenters view differentlythe reliance on something dubbed a sufficiently "broad spectrum" standard. Besides being precedentially unsupportable, the resulting inquiry demonstrates the "moving target" and "slippery slope" nature of the latest invalidation test. For example, no court ever proposed that the problem with chapter 390 could be solved by making it apply to other religious groups. Yet, the Majority now suggests that the application to *704 secular, as well as religious groups, is not enough. If the statute does not apply to a sufficiently "broad spectrum" of religious groups, then the Majority concludes that it has the impermissible effect of advancing one religion over othersan impermissible accommodation (see, majority opn, at 695). That is plainly wrong.

B. Sufficiently "Broad Spectrum" Standard
The Court propounds today that chapter 390 is not a permissible accommodation because the class benefitted by it is "anything but broad" (majority opn, at 695). Ancillary to this determination is the discrete objection that the eligibility requirements of the statute are "so narrowly drawn" as to prevent other similarly situated groups from qualifying for the statute's entitlements.
Initially, this inverted analysis ignores the presumption of constitutionality beyond a reasonable doubt. It also devalues the constitutional burden into a mere counting exercise. Under the standard presumption of constitutionality, the challengers against chapter 390 must bear the burden to demonstrate the practical impossibility of any general application of the legislation. Challengers did just that in Kiryas Joel II. Quite differently here, the Majority's insistence upon a showing that chapter 390 immediately applies to a sufficiently "broad spectrum" of existing municipalities effectively switches the judicial review standard into a presumption of unconstitutionality. Moreover, it shifts the burden of overcoming the transformed standard onto the defenders of the constitutionality of the statute.
While not expressly so stated, the Majority's concerns here appear to stem largely from some apprehension that the State action inhering in chapter 390 will be perceived as an endorsement of Satmar Hasidism (see, infra, at 707). This concern was first reflected by this Court in Kiryas Joel I, which referenced School Dist. of City of Grand Rapids v Ball (supra). After Agostini, however, Ball and the perception of endorsement no longer provide the dispositive force that the Majority's rationale gives it under the guise of the "broad spectrum" requirement. The Majority flatly refuses to credit the neutral criteria of the statute itself because of a pre-determined concentration on its perceived sense of advancement of one religion over another.
Even if the proponents had to meet this amorphous constitutional standard, we note that it is not surprising that a sufficient population or wealth shift has not occurred over the short span of the statute's existence so as to allow the immediate *705 qualification of more municipalities. Nor is it remarkable that no potential groups have yet undertaken the process of incorporating in order to pursue the benefits of a statute, the constitutionality of which has remained mired in controversy and litigation. The Majority's constitutional barrierthe impermissible accommodation due to an insufficiently "broad spectrum" of religious groupscannot be dispositive or be given the prevailing weight that a constitutionality-reviewing Court inaptly confers in this case.
Furthermore, precedent does not support the application of this theory. Indeed, after Agostini, courts specifically need not look at how many religious or nonreligious groups benefit from a statute or challenged State action (see, Agostini v Felton, supra, at 229-230). Even if we were to recognize and conduct that analytical step, the current practical effect of chapter 390 is that it is equally applicable to sectarian, as well as nonsectarian, municipal assemblages.
The Majority cancels chapter 390 because it may presently be available to only two municipalitiesone undeniably secular in every sense of the word. This contradicts relevant and longstanding precedent and legislative practices in this respect, as well as the expert proof adduced by the proponents of the enactment and expressly adopted by the Governor in signing the bill into law (see, Governor's Mem approving L 1997, ch 390, 1997 NY Legis Ann, at 259 ["Data provided by the State Education Department show ten municipalities throughout the State which are currently eligible to form school districts under the criteria set forth in this legislation, in addition to those that can become eligible in the future"] [emphasis added]; see also, Matter of Wolpoff v Cuomo, 80 NY2d 70, 79, supra). If the mere fact that the source for chapter 390 is traceable originally to one municipality becomes a litmus test of constitutional dimension, the State would have many fewer statutes on its books and the courts can look forward to a lot more legislative review business on that challenge basis.
This Court has repeatedly upheld legislation which has an initial effect on only one municipality so long as the statute, on its face (with the formidable presumption of constitutionality also going for it), is general enough that application to other municipalities is real and available prospectively (see, Matter of McAneny v Board of Estimate & Apportionment, 232 NY 377, 392-393; see also, Hotel Dorset Co. v Trust for Cultural Resources, supra, at 373). That is the nucleus and thrust of much programmatic, remedial legislation. At the very least, "there is *706 no conclusive presumption to the contrary" (Matter of McAneny v Board of Estimate & Apportionment, supra, at 393).
Thus, this Court's Kiryas Joel II decision establishes an uncontestable "given" for the review of chapter 390that the core requirement of a constitutional statute is that it must apply to other municipalities (see, Grumet v Cuomo, 90 NY2d 57, 75, supra). This one now does. Yet, the Majority substitutes a judicial, quantitative arithmetic analysis for the policyempirical calculus that was used by the Legislature and the Governor (see, Matter of Wolpoff v Cuomo, supra).
Also uncontested is the fact that it was perfectly proper for the citizens of Kiryas Joel to take advantage of State legislation that created the Village that exists today. This is "a right that New York's Village Law gives almost any group of residents who satisfy certain procedural niceties" (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 691, supra). Indeed, it probably would have been unconstitutional to deprive these citizens of their right to incorporate simply because the geographic boundaries allowed a Village to be formed consisting solely of members of the same religious beliefs.
Once again, that very municipality similarly seeks to secure and take advantage of other generally applicable legislation. The Majority's decision today essentially, functionally and virtually forever forecloses this right for the citizens of the Village of Kiryas Joel; it deprives them of the opportunity afforded by chapter 390 simply because the civic Village is the first municipal group to utilize the statutory enablement. Were other municipalities to precede Kiryas Joel in opting in under this legislation, just as other communities incorporated themselves as villages prior to Kiryas Joel, the courts would lack the power under the Establishment Clause to deny Kiryas Joel the same statutory benefit. It is sadly ironic that the Legislature's overture to assist the handicapped children of this Village, who require special secular education needs, is again struck down simply because the children happen to be members of the Satmar Hasidim community within a duly incorporated civic Village.

C. Legislative History/Origin
The Majority's references to legislative history and origin (majority opn, at 695, 696) undercut the tripartite system of governance, as well as sound constitutional theory. This approach implies that, because the Legislature has previously made mistakes, it cannot successfully cure its flaws. Under this novel *707 postulate, initial legislative missteps will always emerge from buried stages to haunt legitimate, future efforts.
We respectfully suggest that it is at least equally necessary for the courts to place "history" and "origin", by whatever characterization, in context and to interpret a law as it is written. Instead, the Majority emphasizes that in its draft stages, the bill has been referred to as "Kiryas Joel No. 3" (majority opn, at 695), as though that title carried a constitutional infirmity, rather than simply reflecting the current legislative practice of attaching easily recognizable names to bills for better and broader understanding.
Here, the statute was, indeed, a "direct response to Kiryas Joel II" (majority opn, at 695). Considered from a neutral perspective, we view this fact as supportive, rather than destructive, of the legislative effort. This law, after all, is the result of a concept that has thrice received the deliberative action of both Houses of the State Legislature, two Governors of opposing political parties and has been shaped by decisions of the highest courts of this State and of the United States.
Further, if this Court ever thought that the "history" of this matter would be a perpetual albatross carried through all later drafts and enactments, then it should not have opened the window of a possibly acceptable theory of constitutionality (see, Grumet v Cuomo, 90 NY2d 57, 75, supra). Naturally, the Legislature pointedly and respectfully responded; we believe it did so successfully and constitutionally.
Ironically, the Majority's rejection of chapter 390 fosters a tautological chase that the more the Legislature tries to accommodate concerns adjudicated by the Courts, the more the legislative cause is doomed by its ontology. No matter how many times the other two Branches of State government try to eradicate the Judiciary's perceived and delineated constitutional impediments, the effort loses, rather than gains, ground.

D. The pre-Aguilar Option
The Majority finally urges that chapter 390 offends the neutrality mandated by the First Amendment because, in view of Agostini, Kiryas Joel may have an alternative means by which to provide its education services (majority opn, at 696, 697)again, an unsupportable "perception of endorsement" concern (see, supra, at 704). This mandate turns the constitutional analysis upside down. It does not control the constitutionality of the statute at issue, nor is it appropriate to this Court's analysis in this setting. This reliance on an abstract, premature *708 option is, at best, advisory, and, at worst, it contradicts the legitimate presumption of constitutionality of the instant statute and creates an improper judicial balancing act in scrutinizing the constitutionality of the statute that was actually enacted (see, supra, Part I). Indeed, the very fact that the Monroe-Woodbury School District is a party urging the constitutionality of chapter 390 more assuredly reflects that the pre-Aguilar system is not even a realistic option, no less a pre-judged constitutional one.
This judicial musing is inappropriate. To support its theory, the Majority weakly relies on rhetoric from the losing side of the debate in the Legislature. This unlikely source simply cannot trump the overarching separation-of-powers presumptions by which this Court must be governed in ruling on the constitutionality of chapter 390the only enactment and issue before this Court at this time.
Finally, we generally agree with the Majority's exhortation that the two sides "make every effort" to reach an accord (majority opn, at 697) as that would be a most decorous solution to any litigation. In view of the history of this case, however, this proposal is particularly precatory. In the end, the role of this Court is to decide the case presented and establish the guiding precedent based on careful, precise constitutional analysis.

V.
The intractable drama of this dispute has a David and Goliath staging to ityet, it is difficult to decide who will be left standing in the end as the true victor or hero. This profound conflict represents a third constitutional crossroads for this Court and a potential fact pattern for a second review by the Supreme Court of the United States. The realm of Establishment Clause jurisprudence remains particularly conflicted as evidenced by this case. Until Agostini, cases seemed to increase the tension between the Constitution's traditional and fundamental guarantees of free exercise of religion and free association. Much remains unsettled, but, in one sense, Agostini provides a potent lesson that it is not un-American or unconstitutional to refuse to be absorbed into the melting pot.
The civic and legal activity of this Hasidic community has been challenged through successive litigations for daring to go so far as to exercise a right to petition government repeatedly for redress. These citizens simply took their place in the long line of supplicants walking and working the corridors of power *709 in the Statehouse. In this respect, they paradoxically conformed to society's methods. The core of objection against this minority community, through this and previous litigation, is that they have been too successful in not giving up their quest to gain the open and official attention of the Executive and Legislative Branches of government. Their perseverance and that of the Legislature and Governor are turned topsy-turvy into an instrument of invalidation of the lawmaking product of the other two Branches. This nullification is unwarranted and persuades us to dissent and vote to reverse and declare chapter 390 constitutional.
Order affirmed, with costs.
NOTES
[1] Laws of 1989 (ch 748) provided:

"Section 1. The territory of the village of Kiryas Joel in the town of Monroe, Orange county, on the date when this act shall take effect, shall be and hereby is constituted a separate school district, and shall be known as the Kiryas Joel village school district and shall have and enjoy all the powers and duties of a union free school district under the provisions of the education law.
"§ 2. Such district shall be under the control of a board of education, which shall be composed of from five to nine members elected by the qualified voters of the village of Kiryas Joel, said members to serve for terms not exceeding five years.
"§ 3. This act shall take effect on the first day of July next succeeding the date on which it shall have become a law."
[2] Education Law § 1504 (former [3]) (a), as added by L 1994, ch 241, stated: "(i) the enrollment of the municipality seeking to organize such new school district equals at least two thousand children, and is no greater than sixty percent of the enrollment of the existing school district from which such new school district will be organized; (ii) such new school district would have an actual valuation per total wealth pupil unit at least equal to the statewide average; (iii) the enrollment of the existing school district from which such new school district will be organized equals at least two thousand children, excluding the residents of such municipality; and (iv) the actual valuation per total wealth pupil unit of such existing school district will not increase or decrease by more than ten percent following the organization of the new school district by such municipality."
[3] Education Law § 1504 (3), as added by L 1997, ch 390, states in full:

"3. Any municipality situated wholly within one central or union free school district but whose boundaries are not coterminous with the boundaries of such school district may organize, pursuant to the provisions of the subdivision, a new union free school district consisting of the entire territory of such municipality whenever required by the educational interests of the community.
"a. No such new school district may be organized unless: (i) the enrollment of the municipality seeking to organize such new school district equals at least two thousand children, and is no greater than sixty percent of the enrollment of the existing school district from which such new school district will be organized; (ii) such new school district would have an actual valuation per total wealth pupil unit at least equal to the statewide average; and (iii) the enrollment of the existing school district from which such new school district will be organized equals at least two thousand children, excluding the residents of such municipality."
[4] At the outset of the controversy the New York State School Boards Association, Shipley and Grumet were named plaintiffs. Although, technically, the Association was dismissed for lack of standing, the record continues to reflect plaintiffs' counsel as the New York State School Boards Association.
[5] On this appeal, the American Jewish Congress submitted a brief amicus curiae arguing that chapter 390 is unconstitutional, and The Becket Fund for Religious Liberty argued that the statute is constitutional.
[6] While the dissent correctly notes that statutes are presumptively constitutional, that doctrine cannot insulate a statute that violates fundamental neutrality principles (see, e.g., Grumet v Cuomo, 90 NY2d 57, supra).
[7] The dissent cites a 1997 memorandum submitted by the Governor in support of the statute's enactment, noting that 10 municipalities would be eligible to form school districts under chapter 390 (dissenting opn, at 706). Both lower courts, however, concluded from the record statistics that only two are eligibleKiryas Joel and Stony Point. Appellants themselves do not assert that there are 10 eligible municipalities. Appellants themselves say only that the number of present and future municipalities that qualify under the statute "remains uncertain" and "may exceed" the two that have been identified. They identify no additional eligible municipalities. Defendants' tenuous and speculative assertions that other municipalities will qualify under the statute's criteria in the future raise only "theoretical possibilities" that lend no meaningful support to the contention that chapter 390 is a religion-neutral law of general applicability (Kiryas Joel II, 90 NY2d 57, 71, 73).
[8] We do not apply a "precedentially unsupportable" "broad spectrum theory" here (dissenting opn, at 703). (See, Widmar v Vincent, 454 US 263, 274; Board of Educ. of Westside Community Schools v Mergens, 496 US 226, 252; Walz v Tax Commn. of City of N. Y., 397 US 664, 673; Bowen v Kendrick, 487 US 589, 608; Kiryas Joel II, 90 NY2d, supra, at 70, 75.) Moreover, Agostini does not support the proposition that, in determining secular effect, courts need not consider whether a challenged State action benefits a broad spectrum of groups (dissenting opn, at 705; see, Agostini v Felton, 521 US, at 231, supra [citing Widmar v Vincent, 454 US, at 274, for the proposition that the "provision of benefits to so broad a spectrum of groups is an important index of secular effect"]).
[9] This Court, in Grumet v Cuomo (90 NY2d 57, supra), did not suggest the outlines of chapter 390 (see, dissenting opn, at 700-701). The Court identified two eligibility criteria in chapter 241 that were devoid of any legitimate purpose, but never suggested that mere deletion of those defective provisions would render the statute constitutional. To the contrary, the Court observed that "the Legislature might have achieved a constitutionally acceptable result had it enacted a truly religion-neutral law of general applicability that the Village of Kiryas Joel, as one in a broad array of eligible municipalities, might have invoked" (id., at 75). That was not done.
[10] While the status of the endorsement test employed by this Court in Grumet v Cuomo is uncertain, consideration of a statute's actual effectthe central focus of our analysis hereremains a valid inquiry in determining whether a law has the primary effect of impermissibly advancing religion (see, Agostini v Felton, 521 US, at 222-223, supra; see also, id., at 235 [the same considerations that led the Court to conclude that title I did not have the effect of advancing religion also required the Supreme Court "to conclude that (the program) * * * cannot reasonably be viewed as an endorsement of religion"]; McCarthy, The Road to Agostini and Beyond, 124 Ed Law Rep 771 [Agostini can be read as "providing modest support" for the endorsement standard championed by Justice O'Connor in reviewing Establishment Clause claims]; but see, dissenting opn, at 704, 705 [questioning viability of endorsement test in the wake of Agostini]). In any event, we do not employ an endorsement analysis in this case.
[11] Contrary to the dissent's reading of the majority opinion as holding that statutes that do not apply to a sufficiently broad spectrum of religious groups will automatically be considered unconstitutional, there is nothing in our analysis that stands for that proposition (dissenting opn, at 704 [citing majority opn, at 695]).
[12] Any analogy between chapter 390 and Village Law § 2-200, under which Kiryas Joel incorporated, is misplaced (dissenting opn, at 703). Indeed, the Village Law provides a good example of a religion-neutral, generally applicable law that applies to a broad spectrum of beneficiaries, and a good contrast to chapter 390.